**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-40015
_____


KATHLEEN E. MYERS,

Plaintiff-Appellee,

VERSUS

KODAK HEALTH IMAGING SYSTEMS LONG-TERM DISABILITY PLAN, et al.,

Defendants,

KODAK HEALTH IMAGING SYSTEMS LONG-TERM DISABILITY PLAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
(4:95-CV-261)
_____

March 22, 1999

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Kathleen Myers applied for long-term disability benefits from

Kodak Health Imaging Systems Long-Term Disability Plan. The plan

administrator denied the request, and Myers sought judicial review

under § 1132(a)(1)(B) of the Employee Retirement Income Security

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Act of 1974 ("ERISA").[1]  The district court reversed the plan administrator's denial of benefits because it determined that she had abused her discretion in denying benefits.  Finding no abuse of discretion on the administrator's part, we reverse the judgment of the district court.

## I.

Myers began working for Vortech Data, a company eventually acquired by Kodak Health Imaging Systems ("KHIS"), in April 1991. She ultimately became KHIS's regulatory and compliance manager. Her annual salary, which was $58,000 when she began with the company, grew to $90,525 by early 1994.  She also took advantage of an employee benefits package that included short-term disability benefits and membership in the Kodak Health Imaging Systems Long-Term Disability Plan (the "LTD Plan" or "the Plan"), which is the defendant in this case.

The version of the Plan in which Myers participated promised to pay seventy percent of her salary should she become totally disabled.  She paid for this benefit by payroll deduction.  KHIS provided her with a handbook entitled *Kodak Health Imaging Systems Choices for Tomorrow*, which included a summary (the "summary plan description" or "SPD") of the LTD Plan's benefits.  Myers read and relied on the benefits handbook when she received it.

---

[1] Section 1132(a)(1)(B) authorizes a beneficiary of, or participant in, a plan to sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

2

The LTD Plan itself spelled out in greater detail the terms of the disability coverage. It provided that participants could receive benefits in the event they became totally disabled while covered by the Plan, and it defined "disability" to require, *inter alia*, a "condition [that] results in a Participant's total and continual inability to engage in Gainful Work."

The LTD Plan and the SPD give different definitions of "Gainful Work." Under the LTD Plan, "'Gainful Work' means paid employment for which a person is, or becomes, reasonably qualified by education, training, or experience, and which is more than transitory in nature, as determined by the Claims Administrator . . . [but which] does not include Rehabilitative Employment." Under the SPD, "'Gainful Work' is substantial paid employment for which [claimant is] (or [claimant] become[s]) reasonably qualified by education, training or experience, all as determined by MetLife."[2]

In early 1994, KHIS conducted a salary study and decided that Myers's salary of $90,525 exceeded the benchmark range for her position. On May 25, 1994, her supervisor, Carl Alletto, informed her that her salary would be reduced to $70,610. Thereafter, she never reported for work.

Myers immediately began short-term disability leave, during which she sent several detailed letters to the administrator of the LTD Plan, concerning Myers's compensation and other matters related to her employment. In October 1994, Myers applied for long-term

---

[2] MetLife was designated as the claims administrator.

benefits under the Plan.  When her short-term disability benefits terminated on November 25, 1994, her employment ended.  This date is significant, because the LTD Plan requires that a claimant have become "totally disabled" on or before the date his employment ends.

The Plan appointed MetLife to administer Myers's application[3] and retained National Medical Review ("NMR") to assist in reviewing the application.  NMR provided physicians, who were board-certified in occupational medicine, to review the medical information Myers had submitted in connection with her application for benefits, analyze the information within the framework of the LTD Plan and its SPD, and issue an opinion as to whether she had experienced "total disability" before her termination.

MetLife sent the two physicians who reviewed Myers's files, Drs. Robert Porter and  Robert Petrie, a "Medical Review Referral Form" stating that KHIS's "definition of disability is: must be totally disabled from any and all occupations from the onset." Together, Petrie and Porter issued six opinions stating that Myers was not totally disabled as of November 25, 1994.  The district court found that Petrie and Porter had relied on the "any and all occupations" definition provided by MetLifeSSnot the definition in the SPDSSin reaching their conclusions.

Based on its determination that Myers was not totally disabled, MetLife initially denied Myers's application on

_____

[3]  The terms of the LTD Plan permitted the appointment of a claims administrator to make the initial determination of whether a claimant is eligible for long-term disability benefits.

December 20, 1994, but, because it had experienced some difficulty in obtaining information from Dr. David Buhner, one of Myers's physicians, MetLife advised Myers that she could submit additional information in support of her application. Upon receiving information from Buhner, MetLife again denied the application on February 15, 1995, and instructed Myers on how to appeal the denial.

Myers did so on March 9, 1995. During her appeal, she submitted to MetLife and the plan administrator voluminous documents, including medical literature, several sets of medical records, and statements of physicians, family members, and friends. MetLife forwarded this information to the NMR doctors, who continued to opine that Myers was not totally disabled and could perform sedentary jobs. On September 19, 1995, the plan administrator formally denied Myers's appeal, explaining that, "[a]ccording to all of the medical and vocational information we have received regarding Ms. Myers' claim, it has not been established that she is totally disabled."

Myers sought judicial review under § 1132(a)(1)(B). The district court reversed the denial, finding that the plan administrator "relied on the standard in the LTD plan document [when] [t]he standard of disability which should be applied to Plaintiff's benefits claim is the standard of disability contained in the SPD for the LTD Plan." The court concluded that "[t]he decision to deny Plaintiff's benefit claim and her appeal was not supported by substantial evidence if the definition of disability

5

in the SPD is used." The court declined to remand to the administrator for application of the correct standard; it simply ordered the Plan to pay LTD benefits and awarded attorneys' fees.

## II.

The Plan contends that there is substantial evidence in the record to support the administrator's decision to deny LTD benefits, that the administrator did not abuse her discretion in denying Myers's application, and that the court thus erred in reversing the administrator's decision. We agree.

## A.

A somewhat complicated standard of review governs ERISA actions in which plaintiffs appeal benefits determinations. The district court first reviews the plan administrator's decision, and we must then review that court's analysis. Because our review requires us to evaluate the district court's performance, we first delineate the standard of review the district court is to apply to the benefits determination. We then consider the standard of review we apply to the district court's decision.

## 1.

A plan administrator deciding whether to pay benefits "must make two general types of determinations: 'First, he must determine the facts underlying the claim for benefits . . . . Second, he must then determine whether those facts constitute a claim to be

6

honored under the *terms* of the plan.'" *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394 (5th Cir. 1998) (quoting *Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1557 (5th Cir. 1991)). For the administrator's factual determinations, the district court is to apply an abuse of discretion standard. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., Med. Benefits Plan*, No. 98-40204, 1999 U.S. App. LEXIS 3643, at *5 (5th Cir. Mar. 4, 1999) (citing *Pierre*, 932 F.2d at 1562). Abuse of discretion review, as applied to an administrator's factual determinations, "is limited to determining whether there is substantial evidence in the record to support [the plan administrator's decision]."[4] *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir. 1996).

As for the second type of determination a plan administrator must make (*i.e.*, interpretation and application of the plan), the district court is to review the administrator's decision "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the abuse of discretion standard applies. *Schadler*, 147 F.3d at 394

---

[4] An alternative characterization of our abuse of discretion review, as applied to an administrator's factual determinations, is "arbitrary and capricious" review. *See*, *e.g.*, *Penn v. Howe-Baker Eng'rs, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990). Although in *Pierre*, 932 F.2d at 1562, we refused to equate "abuse of discretion" and "arbitrary and capricious" standards, our analysis in that case was anomalous, for, as we recently explained, "we decline to follow *Pierre* to the extent that it rejects the use of the "arbitrary and capricious" analysis as part of abuse-of-discretion review." *Meditrust*, 1999 U.S. App. LEXIS 3643, at *9. Instead, we are bound by *Penn*'s holding that the abuse of discretion standard of review for factual determinations amounts to arbitrary and capricious review. *Id.* This is consistent with the great weight of authority from other circuits. *Id.* at *9 n.6.

7

(quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  The LTD Plan plainly vested the plan administrator with discretionary authority to interpret plan terms and determine eligibility,[5] so the abuse of discretion standard of review applied to the administrator's plan interpretation and eligibility determination.

When the issue under review is plan interpretation and application, as opposed to pure fact-finding, the abuse of discretion standard involves a two-step inquiry:[6]

> The court must initially determine whether the administrator's interpretation of the plan is the legally correct interpretation.  If the administrator's interpretation of the plan is legally correct, then the inquiry ends because no abuse of discretion could have occurred.  However, if the court determines that the administrator's determination is not legally correct, then it must further determine whether the administrator's decision was an abuse of discretion.[7]

"The fact that an administrator's interpretation is not the correct one does not in itself establish that the administrator abused his

---

[5] Article 9.1(c) of the LTD Plan provided:

The Plan Administrator shall have full discretionary authority in all matters related to the discharge of responsibilities and the exercise of authority under the Plan including, without limitation, his construction of the terms of the Plan and his determination of eligibility for Coverage and Benefits.  It is the intent of the Plan that the decisions of the Plan Administrator and his action with respect to the Plan shall be conclusive and binding upon all persons having or claiming to have any right or interest under the Plan . . . .

[6] The two-step inquiry does not apply to factual determinations, which are subject to an abuse of discretion review that essentially amounts to "look[ing] at the administrative record and determin[ing] whether the administrator's decision was supported by substantial evidence." *Rigby v. Bayer Corp.*, 933 F. Supp. 628, 632–33 (E.D. Tex. 1996).  *See Meditrust*, 1999 U.S. App. LEXIS 3643, at *11; *see also Rutledge v. American Gen. Life & Acc. Ins. Co.*, 914 F. Supp. 1407, 1410–11 (N.D. Miss. 1996).

[7] *Schadler*, 147 F.3d at 394 n.5 (quoting *Spacek v. Maritime Ass'n, ILA Pension Plan*, 134 F.3d 283, 292–93 (5th Cir. 1998).  *See also Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992).

8

discretion," *Wildbur*, 974 F.2d at 638, and we have identified three considerations that "are important" in analyzing whether there was an abuse of discretion: "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Id.* (citation omitted).

The plan administrator made a factual determination (*i.e.*, that Myers is not disabled) and an interpretive decision (*i.e.*, that the facts warranted a denial of benefits). Both are subject to abuse of discretion review by the district courtSSthe former to review for substantial evidence, and the latter to review under the two-step test articulated in *Wildbur*.

2.

Our review of the district court's analysis is governed by the following principles:

> On appeal from a district court's judgment in a § 1132(a)(1)(B) case, our traditional standards of review apply, and we review *de novo* the district court's holding on the question of whether the plan administrator abused its discretion or properly denied a claim for benefits. However, we will set aside the district court's factual findings underlying its review of the plan administrator's determination only if clearly erroneous.

*Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601 (5th Cir. 1994). *Accord Meditrust*, 1999 U.S. App. LEXIS 3643, at *7 (citing *Sweatman*, 39 F.3d at 601). The key question, then, is whether the Plan is attacking a finding of fact by the district court (*i.e.*, the court's factual determination that Myers was disabled) or the

court's holding that the plan administrator's denial of benefits was an abuse of discretion.[8] If the former, then this court would review the determination for clear error, for the question of whether a claimant is disabled is "more factual in nature than interpretive in nature," and a district court answering that question is therefore entitled to greater deference. *Sweatman*, 39 F.3d at 598. If, however, the Plan is attacking the district court's determination that the plan administrator abused her discretionŠŠa mixed question of law and factŠŠ*de novo* review is appropriate. *See id.* at 600.

The Plan cannot be challenging the court's factual determination that Myers is "disabled" under the terms of the LTD plan, because the court did not make such a finding. In its list of twenty-two "findings of fact," the court entered only one finding that has anything to do with Myers's disability: In finding number 22, the court determined that "[t]he decision to deny Plaintiff's benefit claim and her appeal was not supported by substantial evidence if the definition of disability in the SPD is used."

In other words, the court did not look at the evidence and make the purely factual determination that Myers was disabled. Instead, it examined the record and determined, *as a matter of law*,

---

[8] The parties disagree over what standard of review applies to the district court's determination that the Plan's decision to deny Myers's claim was not supported by substantial evidence. The Plan contends that we review the determination *de novo*; Myers asserts that the determination is factual and is therefore subject to an abuse of discretion standard of review. We agree with the Plan.

that the evidence was insufficient to support a finding of disability under the SPD. The court thus answered either a question of law or a mixed question of law and fact, and the proper standard of review is therefore *de novo*.[9] Under such a standard, our task is to determine, upon a fresh look at the record and without affording deference to the district court, whether that court erred in determining that the administrator abused her discretion in denying Myers's request for LTD benefits.

## B.

The district court erred in holding that the plan administrator abused her discretion in denying benefits. Myers had the burden of proving entitlement to LTD benefits under the plan,[10] and the adminisrator's determination that Myers had failed to

---

[9] The *Sweatman* court outlined the general principles guiding the determination of which standard of review to apply:

> On appeal, our standard of review for district court decisions reviewing plan administrators' eligibility determinations is guided by the principles that typically guide our standard of review. Namely, we review questions of law *de novo* and set aside factual determinations only if clearly erroneous. Consistent with these principles, we review a district court's determination of whether a plan administrator abused its discretionSSa mixed question of law and factSS*de novo*.

39 F.3d at 600. *Accord Meditrust*, 1999 U.S. App. LEXIS 3643, at *7.

[10] "A claimant under section 1132(a)(1)(B) has the initial burden of demonstrating an entitlement to benefits under an ERISA plan, or that a denial of benefits under an ERISA plan is arbitrary and capricious." *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993). Hence, Myers initially had the burden of proving that she was totally disabled.

The district court's factual determination that the administrator and the NMR physicians evaluated Myers's application using the wrong standard of gainful work (and thus did not prove that she was not totally disabled) does not entail its conclusion that she was entitled to benefits; she still had to prove disability. Hence, evidentiary equipoise would indicate that there was sufficient evidence in the record to sustain the administrator's denial and that the administrator thus did not abuse her discretion.

11

shoulder that burden was not an abuse of discretion.  The administrator's interpretive decisions (*i.e.*, her interpretation of the plan and her decision to deny benefits given the facts found) did not constitute abuses of discretion under the two-step inquiry articulated in *Wildbur*, and her factual determinations were supported by substantial evidence.

1.

We first consider the plan administrator's interpretive decisions, for it was her interpretation of the term "gainful work" that most troubled the district court.  The court determined, as a matter of fact, that the administrator's denial of Myers's request for benefits relied on the LTD Plan's "paid employment" definition of the term "gainful work" and that the administrator had not employed the SPD's "substantial paid employment" definition of the term.  There is sufficient support for this finding in the record, and it is thus not clearly erroneous.[11]

---

[11] The administrator's final letter denying Myers's request for benefits references § 2.30 of the LTD PlanSSthe provision that defines "gainful work" as "paid employment"SSand states that Myers is not totally disabled because she can perform such work.  The Plan argues that the district court erred in finding that the administrator used the LTD Plan's definition of gainful work, because the administrator's testimony indicates that she actually applied the SPD's definition of the term and considered only "substantial paid employment."  Indeed, when asked "What did you interpret the definition of gainful work under the LTD Plan to mean?", the administrator responded:

> Work for which an individual is reasonably qualified and which was not transitory.  I interpreted it as not being menial.  *I interpreted it not as being insubstantial*, but definitely what someone was reasonably qualified to do based on their education and training, experience. [Emphasis added.]

Despite this testimony, we decline to reverse the district court's factual determination that the administrator employed the LTD Plan's definition of gainful work.  Soon after the testimony cited above, the court interrupted

(continued...)

12

In employing the LTD Plan's definition of "gainful work," the administrator failed to give the Plan the legally correct interpretation. In *Hansen v. Continental Ins. Co.*, 940 F.2d 971 (5th Cir. 1991), we required plan administrators and courts to apply the terms of the summary of a benefits plan when those terms conflict with those of the full plan document.[12] Here, the summary

---

(...continued)
examination and directly asked the administrator, "Do you consider in your mind that there is a difference between paid employment and gainful employment?", to which the answer was "No." This frank resonse supports the finding that the administrator interpreted gainful work as the LTD Plan provided§§*i.e.*, as paid employment§§and the court thus did not clearly err in finding that the administrator applied the LTD Plan's "paid employment" standard.

[12] The Plan asserts that the rule articulated in *Hansen* applies only "where the summary description taken in its most natural reading would entitle a plan participant to plan benefits and a natural reading of the plan document would not." But *Hansen* nowhere states that the rule announced therein is so limited. The *Hansen* court made its holding plain:

> This Court holds that the summary plan description is binding, and that if there is a conflict between the summary plan description and the terms of the policy, the summary plan description shall govern. Any other rule would be, as the Congress recognized, grossly unfair to employees and would undermine ERISA's requirement of an accurate and comprehensive summary.

*Hansen*, 940 F.2d at 982. Furthermore, it stated that

> *[a]ny* burden of uncertainty created by careless or inaccurate drafting must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.

*Id.* (emphasis added).

The case the Plan cites as "explaining the limited reach of *Hansen*" also fails to support the Plan's claim that Hansen covers only major conflicts. In that case, *Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 939 (5th Cir. 1993), we did state that "[a] careful reading of *Hansen* . . . reveals that its principal concern was with *positive* inconsistencies, either within the SPD or between the SPD and the master documents." We were not saying, however, that the inconsistencies had to be great. The issue was whether there was an ambiguity requiring a pro-beneficiary interpretation in an SPD that included information about amendment and termination of the plan under the heading "OTHER IMPORTANT INFORMATION" instead of under the heading "WHEN YOUR COVERAGE WILL END." In requiring "*positive* inconsistencies" to invoke the *Hansen* rule, we were simply requiring participants to show an actual inconsistency between the text of the

(continued...)

13

defined gainful work as "substantial paid employment," and the LTD Plan defined the term as "paid employment . . . which is more than transitory in nature." There is a genuine difference between these two definitions,[13] and under *Hansen*, the SPD's definition applies. Hence, the administrator's application of the LTD Plan's "paid employment" definition of gainful work was legally incorrect.

"The fact that an administrator's interpretation is not the correct one does not in itself establish that the administrator abused his discretion." *Wildbur*, 974 F.2d at 638. Indeed, "[i]f a court concludes that the administrator's interpretation is incorrect, the court must then determine whether the administrator abused his discretion" in denying benefits. *Id*. Balancing "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith," *id.*, we conclude that the plan administrator's decision to deny

---

(...continued)
SPD and that of the plan; we were declining to find an impermissible ambiguity on the basis of a shoddily organized, but not inconsistent, SPD.

[13] The Plan argues that there really is no difference between the definitions of "gainful work" in the two documents. The SPD defines gainful work as "substantial paid employment," and the LTD Plan defines it as "paid employment . . . which is more than transitory in nature." The district court erred, the Plan urges, in ignoring the "more than transitory in nature" part of the LTD Plan's definition.

But "substantial paid employment" is not the same as "paid employment . . . which is more than transitory in nature." "Transitory" is a temporal measure; it means "passing, temporary, not lasting." NEW WEBSTER'S DICTIONARY 1014 (1992). "Substantial" means "having real existence, not imaginary; firmly based, . . . relatively great in size, value or importance." *Id*. at 987. One could find nontransitory paid employment that is nonetheless insubstantial. For example, one might find a permanent part-time job. In such a case, there would be no gainful work under the SPD, but there would be gainful work under the LTD Plan. Hence, there is a genuine, positive conflict between the terms of the two documents.

14

benefits did not amount to an abuse of discretion, despite the fact that she employed an incorrect interpretation of the plan.

While the administrator's interpretation of gainful work (*i.e.*, non-transitory paid employment) and the correct definition under the plan (*i.e.*, substantial paid employment) are somewhat inconsistent, the inconsistency is not grave.  Moreover, despite the fact that there is a theoretical possibility that the administrator could have found Myers able to perform non-transitory, but not substantial, paid employment, the evidence indicates that the jobs for which she found Myers qualified were, in fact, substantial.[14]  Hence, any inconsistency between the administrator's interpretation and the applicable terms of the plan was irrelevant.

Myers has pointed to no "relevant regulations" that would indicate an abuse of discretion, so the only factor left to balance is the factual background of the termination and any inferences of lack of good faithSSa factor that "really involves two separate

---

[14] When asked, "What kinds of work specifically did you envision in reaching your determination that Ms. Myers could engage in gainful work?", the administrator responded:

> I considered knowing the type of work she was doing and knowing her credentials from her resume.  I considered such things as consulting work for a contract employer that would utilize her skills and understanding; an awful lot of computer-oriented systems, regulations for FDA GNP, a lot of skills and experience that I feel, based on my experience, are well sought after bySSby other companies as they were by us.

> I considered her knowledge of not only our products, but the products of other businesses that she had worked for that she might be able to perform a job in computer service or handling customer complaints.  Her computer skills had exposed her to many different industries, like banking, insurance, that she might be able to, again, provide some consultant services in that direction.

15

questions." *Wildbur*, 974 F.2d at 638.  There is plenty of factual support in the record to sustain a determination that Myers was not totally disabled, regardless of what definition of gainful work is applied.  *See infra* part II.B.2.

There is also no evidence suggesting bad faith on the part of the administrator.  Although she was an employee of KHIS, and we are called to "weigh any potential conflict of interest in [our] determination of whether [a] plan administrator abused its discretion," *Sweatman*, 39 F.3d at 599, there is no evidence that the administrator was under any pressure to avoid paying benefits to deserving claimants; the mere fact that an administrator is employed by the entity that must pay benefits does not create an inference of bad faith.  *See id.*

Absent some concrete showing of bad faith, we will not infer such from the mere fact that the administrator was employed by the plan, especially given the strong evidence, discussed below, indicating that Myers was not totally disabled.  Our performance of the two-step abuse of discretion standard for plan interpretation and benefits determination decisions therefore reveals no abuse of discretion in the administrator's interpretive decisions.

2.

The administrator's factual determination that Myers was not totally disabled also survives abuse of discretion review.  The administrator determined that "Myers has the skills required to perform a number of sedentary jobs" and is thus not "totally

disabled."[15] Under the abuse of discretion standard of review for factual determinations, the district court was to determine whether substantial evidence supports this finding. It concluded that there was insufficient evidence to support the finding, because the administrator "reviewed Myers' claim under the wrong standard and relied on reports based on the wrong standard." Regardless of what standard the administrator applied, however, there was plenty of evidence in support of the factual determination that Myers could perform substantial sedentary work and was thus not totally disabled.

The administrator's personal observations of Myers supported the conclusion that she was not totally disabled. The administrator had numerous opportunities to observe Myers. They worked on the same floor from late 1993 until January 1994, and saw each other several times a day. From January 1994 until Myers began short-term disability in May 1994, the two worked on different floors but still saw or interacted with each other twice or thrice a week. At no time during these interactions did the administrator observe any manifestations of Myers's claimed disability. Plan administrators may consider their personal observations of claimants in reviewing applications for disability benefits.[16]

---

[15] The question whether a claimant is disabled is "more factual in nature than interpretive in nature." *Sweatman*, 39 F.3d at 598.

[16] *See Sweatman*, 39 F.3d at 597 (plan administrator relying on, among other things, claim investigator's observations of participant's ability to engage in commonplace activities).

The administrator also considered the fact that Myers never had reported what Myers now casts as long-standing and severe health problems to the KHIS Human Resources Department, which the administrator directed. As Human Resources Director, the administrator was kept apprised of the debilitating health conditions and chronic absentee or tardiness problems of all KHIS employees, and the fact that she never heard anything about Myers's alleged disabilities is evidence that Myers was not as disabled as she now claims.[17] In addition, Myers's direct supervisor informed the administrator that he was unaware that Myers was suffering from any extended illness or disabling condition.

The circumstances surrounding Myers's departure on leave also contributed significantly to the substantial evidence underlying the administrator's factual determination that Myers was not totally disabled. Myers left KHIS the very day she was told her salary would be cut from $90,500 to $70,610. Her annual benefits under the LTD Plan would total 70% of $90,500, or $63,350SSquite close to the salary she would have earned after the reduction. This "fishy" departure, in combination with the administrator's observations of Myers at work and Myers's failure to report any serious ailments to Human Resources, indicates that Myers may have overstated her disabling conditions, choosing to live off

---

[17] Myers correctly asserts that the absence of reports of her health problems to KHIS's Human Resources Department does not establish the absence of such health problems. But Myers had the burden of proving total disability; the Plan did not have the burden of proving the lack thereof. *See Perdue*, 7 F.3d at 1254 n.9. The administrator thus could rely on the lack of reports to Human Resources in determining that Myers had not shouldered her burden.

disability payments instead of a reduced salary.

The correspondence Myers sent the administrator during the time Myers was on short-term disability leave provided additional evidentiary support for the administrator's factual determinations. The administrator testified,

> I was receiving documents from [Myers] that seemed to demonstrate her ability, as I recall, to write a well-constructed letter with details. It was lucid, well-constructed. And I felt from that that it supported my feeling that there was work that Ms. Myers could do. It also seemed to demonstrate to me her ability to type.

Myers asserts that the letters she sent the administrator while on short-term disability leave provided no evidence of a lack of total disability, because Myers was assisted in constructing the letters and had received a "speaking computer" from KHIS. The administrator, however, did not know about either of these things. When asked, "[D]id you have any information from Ms. Myers that she, indeed, had not typed or constructed the letters that you received?", the administrator replied, "No, absolutely not." The evidence before the administrator when she denied Myers's application, then, supports the view that Myers could craft persuasive written documents and thus was not totally disabled.

The objective medical findings in the NMR physicians' reports also support the administrator's decision. Even if the NMR doctors did use the wrong disability standard in reaching their ultimate conclusion that Myers was totally disabled, their six reports contain numerous objective medical observationsSSstatements that in no way relied on the doctors' understanding of gainful workSSindicating that Myers was capable of substantial paid

19

employment and was not totally disabled, even under the SPD's definition of gainful work.[18]

Myers insists that the NMR reports cannot provide sufficient evidence to support a denial, because the physicians used the wrong standard of disability and did not opine that she was capable of "substantial paid employment," only of "sedentary work."  But the reports do show that Myers has not established fibromyalgia, carpal tunnel syndrome, severe arthritis, or chronic pain.  *See supra* note 18.  Moreover, the reports imply that the "sedentary work" Myers could perform was substantial.[19]

Myers also contends that the NMR physicians' reports cannot constitute evidence that she was not disabled, because they are

---

[18] For example, the December 7, 1994, report concluded that Myers possessed the skills and ability to perform a number of different jobs that "could range from part-time employment in the home using a computer and modem to returning to her present place of employment."  The February 10, 1995, report stated that (i) "Ms. Myers's main problem is fatigue related to her obesity"; (ii) "patients with fibromyalgia are, in fact, best to continue with productive lifestyles and, in fact rest and avoidance of socialization has a negative effect on these individuals"; and (iii) Myers's medical history does not "demonstrate any evidence of severe arthritis or other conditions that may limit her mobility."

The June 7, 1995, report states that (i) although Myers's medical history is "suggestive of a diagnosis of fibromyalgia . . . there is insufficient evidence in the records to indicate that the diagnosis of fibromyalgia has been made using strict clinical criteria"; (ii) Myers's medical records indicate "a fleeting C1 neuropathy, which is not consistent with carpel [sic] tunnel"; and (iii) "individuals with fibromyalgia do benefit from returning to employment and a productive lifestyle." And one of Dr. Porter's reports, which reviewed the medical records of Myers's primary care physician, noted:

The records do support significant obesity and hypertension on a chronic basis, but there is no suggestion that these diagnoses should prohibit sedentary work.  It is interesting that there are no complaints of chronic pain or diagnoses of fibromyalgia in these notes dating over a six and a half year time frame.  There is, likewise, no documentation of carpal tunnel syndrome or other neurological conditions.

[19] Dr. Petrie's December 7, 1994, report concluded that Myers possessed the skills and ability to perform a number of different jobs "which could range from part-time employment in the home using a computer and modem to returning to her present place of employment."

20

refuted by the opinions of her own treating and examining physicians. But plan administrators may rely on the opinions of consulting physicians who review only a claimant's medical records.[20] Consequently, the objective medical observations in the NMR reports contribute to the substantial evidence underlying the decision to deny LTD benefits.

Finally, Myers's medical records from her own doctor support the denial of benefits. Dr. Buhner, Myers's personal physician, examined her four times before and four times after November 25, 1994, the date by which she must have been totally disabled. On October 19, 1994, Buhner concluded that "until and unless [Myers] achieves a good response to medication, she will remain permanently disabled due to the severity of her pain and fatigue."

Buhner's next few examinations revealed that Myers was responding well. His October 25, 1994, examination showed that she had experienced "about a 40 percent decrease in her pain while on the medication [Prednisone]." He noted in early December 1994 (just two weeks after the critical November 25, 1994, date) that a combination of the medications Soma and Flexeril had given Myers relief from her symptoms, allowed her to sleep better seventy-five percent of the time and did not create hangovers or other side effects. He stated that as late as January 1995, Myers "was still taking Soma and Flexeril and still sleeping better and feeling somewhat better." Buhner had stated in October that Myers would be

---

[20] *See Sweatman*, 39 F.3d at 601-02; *see also Salley v. E.I. Dupont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992) (rejecting the notion that plan administrators must give deference to a claimant's treating physician).

totally disabled "unless and until she achieves a good response to medication," and his subsequent examinations of her showed that she had, in fact, achieved such a response.

In short, numerous items of evidence before the administratorSSthe administrator's personal observations of Myers, reports about Myers at work, the circumstances of her departure on leave, correspondence from her, objective observations in the NMR reports, and the medical records from her own physicianSSsupported the factual determination that "Myers has the skills required to perform a number of sedentary jobs" and is thus not "totally disabled."

While it is possible that none of these pieces of evidence, in isolation, would support the plan administrator's conclusion, when taken together they provide substantial evidence for the conclusion that Myers was capable of substantial paid employment. They therefore indicate that the administrator did not abuse her discretion in finding that Myers was not totally disabled and thus was ineligible for LTD benefits.

REVERSED.

22